**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE
IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
SEPTEMBER 7, 2023

*Gonzáles, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
SEPTEMBER 7, 2023

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| WAHKIAKUM SCHOOL DISTRICT NO. 200, <br><br> Appellant, <br><br> v. <br><br> STATE OF WASHINGTON, <br><br> Respondent. | No. 101052-4 <br><br> EN BANC <br><br> Filed: September 7, 2023 |

GORDON McCLOUD, J.— "It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." WASH. CONST. art. IX, § 1. And our court has clearly held that article IX, section 1 places an affirmative duty on the State to amply fund that "education." *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 585 P.2d 71 (1978); *McCleary v. State*, 173 Wn.2d 477, 269 P.3d 227 (2012).

We must now decide whether the "education" that the State has a "paramount" constitutional "duty" to "ampl[y]" fund includes school capital construction costs. The plain language of article IX, section 1 does not alone answer this question. But reading that provision in the context of the Washington State Constitution as a whole and its development since the state's founding shows

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

that the constitution (1) treats school capital construction costs differently than it treats other education costs and (2) requires the State and local school districts to share the responsibility for those school capital construction costs. For that reason, we hold that the constitution does not include capital construction costs within the category of "education" costs for which the State alone must make "ample provision."

We affirm the trial court's decision to grant the motion to dismiss.

FACTUAL HISTORY

I.  In *Seattle School District* and *McCleary*, this court held that (1) the legislature has a "paramount" duty to "ampl[y]" fund the "education" defined in article IX, section 1 and (2) the legislature had failed to discharge that duty

A. In 1978, *Seattle School District* ruled that article IX, section 1 requires *the State* to make ample provision for education through "dependable and regular" tax sources and that forcing school districts to rely on local levies violated that duty. We didn't explicitly include capital construction in the definition of an article IX, section 1 education

This court interpreted article IX, section 1 for the first time in *Seattle School District.* 90 Wn.2d 476.

In the years before that case was filed, the Seattle School District (District) lacked sufficient state funds to fully educate all of its students. It tried to supplement those funds. The legislature had authorized school districts to supplement insufficient state funding through special excess levy elections, and in

2

1975, the District asked the voters to approve two separate special excess levy proposals to support the District's schools. *Id*. at 485.

Both levy propositions failed. *Id.* The District faced a continuing budget shortfall.

The District then sued the State, claiming that the State failed to discharge its article IX, section 1 duty to make "'ample provision for the education'" of its resident children.[1] *Id*. at 486. Following a nine week trial, the trial court entered detailed findings of fact and conclusions of law. *Id*. at 486-87. Critically, the trial court ruled that "the District's children have a constitutional right to an adequately funded educational program of instruction." *Id.* at 487. The trial court continued that article IX, section 1 places a paramount duty on *the State* to fund that educational program and that "the level of funding provided by the Legislature for the 1975-76 school year was . . . insufficient to comply with the State's paramount duty." *Id.*

The State appealed directly to this court, and we affirmed. We held that article IX, section 1 imposes a judicially enforceable affirmative duty on the State to make ample provision for the education of all children residing within its

---

[1] The District also brought a claim under article IX, section 2, alleging that the State failed to "'provide for a general and uniform system of public schools.'" *Seattle Sch. Dist.*, 90 Wn.2d at 486.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

borders. *Id*. at 520. We continued that this right is "paramount," which means that it is "superior in rank, above all others, chief, preeminent, supreme, and in fact dominant." *Id*. at 511. We further explained that "'ample' . . . means liberal, unrestrained, without parsimony, fully, sufficient'" and that "'provision' . . . means preparation, measures taken beforehand; for the supply of wants; measures taken for a future exigency.'" *Id*. at 516 (quoting the trial court's judgment).

Importantly, this court defined the term "education" broadly and did not explicitly include capital construction costs within that definition. We stated that "education" means

> "all that series of instruction and discipline which is intended to enlighten the understanding, correct the temper, and form the manners and habits of youth, and fit them for usefulness in the future. In its most extended signification it may be defined, in reference to man, to be the act of developing and cultivating the various physical, intellectual, aesthetic and moral faculties."

*Id*.

We acknowledged that this definition of education is not stagnant and that what constitutes ample education at one time might not suffice at another time. *Id*. We also acknowledged that this education need not be "total" but must be a "basic education." *Id*. at 519-20. But we clearly held that this "basic education" must go "beyond mere reading, writing and arithmetic" and must also include "broad educational opportunities needed in the contemporary setting to equip our children for their role as citizens and as potential competitors in today's market as well as in

4

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

the marketplace of ideas." *Id*. at 517 (citing *Robinson v. Cahill*, 62 N.J. 473, 515, 303 A.2d 273 (1973); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603, 87 S. Ct. 675, 17 L. Ed. 2d 629 (1967)). Finally, we held that the legislature has the duty to give substantive meaning to the word "education." *Id*. at 519.

Our court in *Seattle School District* then turned to the type of funding that the constitution requires for this "education." We held that the state constitution requires the State to provide ample funding for a basic education by means of "dependable and regular" tax sources and that the State cannot force school districts to rely on special excess levies. *Id*. at 520. We explained that such levy funding depends on the outcome of local elections and the assessed valuation of taxable real property within a district—so it is neither "dependable" nor "regular." *Id*. at 525.

We therefore concluded that the then-current system of funding for basic education violated article IX, section 1 of our constitution because it forced local school districts to rely on such undependable levies. *Id*. at 537-38.

This court, however, declined to retain jurisdiction. Instead, we stated that we had "every confidence the Legislature will comply fully with the duty mandated by [article IX, sections 1 and 2] within the time specified in the judgment as here modified." *Id*. at 539.

5

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

       B. In 2012, *McCleary* reiterated that article IX, section 1 requires *the State* to make ample provision for education through dependable and regular tax sources, held that the State was still violating that duty, and retained jurisdiction to ensure compliance. We still didn't include capital construction in the definition of an article IX, section 1 education

Thirty-four years later, another set of parents filed another legal claim asserting that the state legislature was still violating its article IX, section 1 duty to fully and amply fund education. In *McCleary*, the McClearys and Venemas[2] brought suit on behalf of their children, who were enrolled in the state's public school system. *Id*. at 511-12. They asserted that despite the decision in *Seattle School District*, their children—and all children in the state's K-12 system—were still suffering from decades of inadequate funding and legislative stalemates. *See id.* at 487-512. They sought declaratory relief.

The bench trial lasted eight weeks, consisted of testimony from dozens of fact and expert witnesses, and included over 500 exhibits. *Id*. at 512-13. At the end of that complex litigation, the trial court agreed with the parents. It ruled that the State had failed to comply with its constitutional duty under article IX, section 1. *Id*. at 513.

---

    [2] The Network for Excellence in Washington School, a statewide collection of school districts, education organizations, and community groups, was also a plaintiff in this suit. *McCleary*, 173 Wn.2d at 511-12.

6

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

On direct appeal to our court, we affirmed. We held that the State had still failed to comply with its article IX, section 1 duty to make ample provision for the education of all children in Washington. *Id*. at 484.

This court's decision in *McCleary* began by detailing the education reforms, recommendations, and issues identified by the legislature during the time between the *Seattle School District* decision and the *McCleary* bench trial. *See id.* at 487-511. This court explained that the legislature had hired consultants to perform a comprehensive study (the Picus and Odden study[3]) of Washington's K-12 finance system. *Id.* at 501-02. That study concluded that the state's K-12 finance system should move to a "prototypical school model," and it recommended across-the-board reforms to bring the finance system into alignment with that newer model. *Id.*

Our decision then addressed the significance of recent legislation that had "laid the foundation for comprehensive reforms to the program of basic education and the K-12 funding system"—Engrossed Substitute House Bill (ESHB) 2261. *Id.* at 505-06; LAWS OF 2009, ch. 548. ESHB 2261 adopted the prototypical school model, but it stopped short of setting out the details of this new funding structure. Instead, it created a work group to do so. *Id.* at 506. A year later, the legislature

---

[3] Study conducted by professors Lawrence Picus of the University of Southern California and Allan Odden of the University of Wisconsin-Madison.

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

enacted the details of the new prototypical school model in Substitute House Bill

(SHB) 2776. *Id.* at 509; LAWS OF 2010, ch. 236. Those details included class sizes,

staffing ratios, materials, supplies, operating costs, transportation funding, and

increased access to full-day kindergarten. *Id.* at 509-10.

Neither ESHB 2261 nor SHB 2776 nor the prototypical school model

provided for capital expenditures.[4] Our decision in *McCleary* nevertheless

explained how important this legislation was to achieving the goal of amply

funding education.

But our decision also explained that the legislature had failed to fund many

of the reforms it outlined in ESHB 2261 and SHB 2776. That is what prompted the

McClearys' and Venemas' lawsuit. *Id.* at 511.  And that is what formed the basis

for our decision.

Our decision reaffirmed much of *Seattle School District*'s conclusions about

the meaning of article IX, section 1. *See id*. at 520-26. We reiterated that the

---

[4] To be clear, both ESHB 2261 and SHB 2776 mention capital expenditures. But neither bill funded or required those expenditures. SHB 2776 created a work group "to develop options for a new system of supplemental school funding through local school levies and local effort assistance" and to create a phase-in plan. SHB 2776, 61st Leg., Reg. Sess., § 6(1), (3)(a) at 13 (Wash. 2010). This work group was also tasked with examining "local school district capacity to address *facility needs* associated with phasing-in full-day kindergarten across the state and reducing class size in kindergarten through third grade." *Id*. at § 6(3)(a) at 13 (emphasis added). Additionally, ESHB 2261's statement of "intent" says, "Significant increases in resources for staffing and class size reduction will have detrimental impact on student learning if school districts hire unprepared teachers and *lack facilities* to house them." ESHB 2261, 61st Leg., Reg. Sess., § 1(4), at 2 (Wash. 2009) (emphasis added).

legislature bears the responsibility for providing the specific details of the constitutionally required "education." *Id.* at 517, 526. We affirmed the trial court's decision that the evidence presented at trial concerning the current system of school funding showed that the State had failed to meet its constitutional duty to fund that "education." *See id*. at 529-37. We summarized that that evidence showed that the State was impermissibly relying on undependable local levies, rather than on stable and dependable statewide funding sources, to provide the article IX, section 1 required program of basic education that the legislature itself had defined. *Id*. at 539.

Then, in crafting a remedy, we looked to ESHB 2261 as a guide for defining the State's specific duties. *Id*. at 543. We relied on trial testimony that "full implementation and funding for ESHB 2261 [would] remedy the deficiencies in the prior funding system." *Id.* We set a deadline of 2018 for the legislature to implement the reforms. *Id*. at 484. And we retained jurisdiction to monitor the legislature's implementation of ESHB 2261 to comply with the State's paramount duty. *Id*. at 545-46.

C.  After our decision in *McCleary*, this court issued a series of unpublished orders. We ultimately terminated sanctions and jurisdiction without explicitly requiring capital construction expenditures

We issued a series of unpublished orders over the next several years while we retained jurisdiction and monitored the State's compliance. Several of those

9

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

unpublished orders concluded that the State was failing to make sufficient progress toward complying with its constitutional obligations. Ords., *McCleary v. State*, No. 84362-7 (Wash. Dec. 20, 2012) [https://perma.cc/43WR-3XYA], (Wash. Jan. 9, 2014) [https://perma.cc/J6W7-V3ME], (Wash. June 12, 2014) [https://perma.cc/EFL4-3-3C8G]. Eventually, we held the State in contempt for its failure to comply and then imposed a $100,000 a day sanction until the State did comply. Ords., *McCleary*, No. 84362-7 (Wash. Apr. 30, 2015) [https://perma.cc/7HYM-42BD], (Wash. June 8, 2015) [https://perma.cc/X99S-V9RC], (Wash. Aug. 13, 2015) [https://perma.cc/6WAL-3KVA].

Then, in 2017, we issued an order acknowledging that the State had passed legislation that, when fully implemented, would bring it into compliance with its constitutional duties according to the basic education identified in ESHB 2261. Ord., *McCleary*, No. 84362-7 (Wash. Nov. 15, 2017), https://www.courts.wa.gov/content/publicUpload/McCleary/McClearyOrder11152 017.pdf [https://perma.cc/KZ7Z-YYJH]. Finally, after the legislature fixed the deadline for the new minimum state salary allocations, the court determined that the State had fully complied with its duty to implement its new program of basic education. Ord., *McCleary*, No. 84362-7 (Wash. June 7, 2018) [https://perma.cc/EJP5-L7FP]. We terminated jurisdiction and lifted future sanctions. *Id*.

10

> D. Today, local school districts and the State share the responsibility for funding school capital costs

In practice today, both the State and the local school districts provide funding for school capital construction costs. The State provides its funding assistance to local school districts primarily through the School Construction Assistance Program (SCAP). This program provides grants to school districts to assist with construction and modernization. Ch. RCW 28A.525; *see School Construction Assistance Program (SCAP)*, WASH. OFF. OF SUPERINTENDENT OF PUB. INSTRUCTION (last visited Aug. 29, 2023) https://www.k12.wa.us/policy-funding/school-buildings-facilities/school-construction-assistance-program-scap.

This program assumes that the State and the local districts share the responsibility for funding school capital construction costs. To be eligible for a SCAP grant, a school district must provide local funding "equal to or greater than the difference between the total approved project cost and the amount of state funding assistance." RCW 28A.525.162(2). But even when the State contributes funds to a school construction project, the school district retains ownership of the school buildings and property and the board of directors of each school district maintains exclusive control of the property. RCW 28A.335.090.

In 2022, the legislature appropriated additional funds to support SCAP and other specific school construction, modernization, and repair projects. *See* LAWS OF 2022, ch. 296, §§ 5001-5012, at 2306-14. This included a $515,000 appropriation

11

to the Wahkiakum School District (WSD) "for a facilities accessibility and security improvement project." LAWS OF 2022, ch. 296, § 5010(9), at 2313.

II.     The WSD alleges that the State is violating article IX, section 1 by failing to provide ample funds for school-related capital construction costs

In this action, the WSD alleges that the State has "fail[ed] to amply fund the [WSD]'s needed facilities [and] infrastructure." Clerk's Papers (CP) at 1. WSD argues that this failure violates article IX, section 1. *Id.* at 3. The complaint explains the impact of this lack of ample funding for facilities and infrastructure: "The [WSD] is a poor, rural school district located along the banks of the Columbia River. It has less than 500 students. Approximately 57% of its students are low income. It has less than 3500 registered voters. And the per capita income of its voters is approximately $29,000." *Id.*

The WSD's complaint makes four broad allegations:

(1) "The [WSD] does not have the facilities needed to safely provide all its students a realistic and effective opportunity to obtain the knowledge and skills encompassed within the word 'education' in Article IX, §1." *Id.* at 22.

(2) "The funding that the State provides to the [WSD] does not correlate to the real cost of providing the safe facilities needed to amply provide all [WSD] students a realistic and effective opportunity to obtain the knowledge and skills encompassed within the word 'education' in Article IX, §1." *Id.* at 23.

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

(3) "The funding that the State provides to the [WSD] does not correlate to the level of resources needed to provide all [WSD] students the safe facilities needed to provide them a realistic and effective opportunity to meet Washington's state learning standards." *Id.*

(4) "The funding that the State provides to the [WSD] does not correlate to the level of resources needed to provide all [WSD] students the safe facilities needed to provide them a realistic and effective opportunity to gain the knowledge and skills outlined in RCW 28A.150.210(1)-(4) and Washington's state learning standards." *Id.* at 24.

The WSD sought declaratory, injunctive, and monetary relief. *Id.* at 24-28. Specifically, the WSD requested that the State pay the cost of rebuilding its elementary, middle, and high schools; it estimated more than $50 million in construction costs. *Id*. at 27-28.

PROCEDURAL HISTORY

The WSD filed its complaint on December 28, 2021. *Id*. at 1.

The State moved to dismiss for failure to state a claim (CR 12(b)(6)) and for lack of jurisdiction (CR 12(b)(1)). *Id.* at 32-58. In support of its CR 12(b)(6) motion, the State argued, "[F]unding for school construction and other capital expenditures is governed by entirely different constitutional and statutory provisions that primarily look to local school districts themselves, with the State

providing funding assistance. As such, WSD fails to state a claim on which relief can be granted . . . ." *Id.* at 42-43. It also argued that the court could not award monetary damages because the legislature has not created a private right of action and monetary damages would violate separation of powers principles. *Id.* at 54-56. In support of its CR 12(b)(1) motion, the State argued that the trial court lacked jurisdiction over the monetary damages claim because the WSD failed to submit a tort claim to the Office of Risk Management before filing suit. *Id.* at 56-57.

The WSD conceded that it failed to file a tort claim form and thus that its claim for monetary damages was barred. *Id.* at 89.[5]

The trial court granted the motion to dismiss with prejudice. *Id.* at 160. The WSD appealed directly to our court. *Id.* at 161, 164. We retained the case.[6]

---

[5] The trial court dismissed all claims without specifying the basis for its dismissal. CP at 160. In briefing before our court, the WSD does not withdraw its concession. It seeks only to preserve its right to file a tort claim, and then amend its complaint accordingly thereafter, if it prevails on the other grounds in our court. It has not prevailed on those other grounds; we therefore do not address the WSD's briefing about whether it could file such a tort claim now, if it did otherwise state a claim.

[6] Ord., *Wahkiakum Sch. Dist. No. 200 v. State*, No. 101052-4 (Wash. Nov. 30, 2022). Amicus briefs were filed by the Washington State School Directors' Association, the Washington Association of School Administrators, and Attorneys for Education Rights.

14

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

STANDARD OF REVIEW

We review CR 12(b)(6) dismissals de novo. *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wn.2d 820, 830, 355 P.3d 1100 (2015). Dismissal is appropriate if the court concludes that the plaintiff can prove no set of facts that would justify recovery. *Id.* We presume that the factual allegations of the complaint are true and draw all reasonable inferences from those allegations in the plaintiff's favor. *Gorman v. City of Woodinville*, 175 Wn.2d 68, 71, 283 P.3d 1082 (2012) (citing *Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998)).

ANALYSIS

I. Neither *McCleary* nor *Seattle School District* explicitly address whether article IX, section 1 includes capital construction costs within the definition of "education" that the State, alone, must amply fund

Article IX, section 1 of the Washington Constitution provides that "it is the . . . duty of the state to make ample provision for the education of all children . . . ." *Seattle School District* and *McCleary* interpreted this provision and gave broad meaning to terms like "ample" and "education." But neither opinion explicitly decided whether capital construction costs are included within the educational costs that article IX, section 1 requires the State, alone, to amply fund.

Our court did issue one unpublished, postopinion order in 2017 that addressed this point. That order stated that the *McCleary* decision "did not address capital costs or suggest that capital expenditures are a component of basic

15

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

education for purposes of article IX, section 1, such that the State must fully fund capital costs attendant to the basic education program." Ord., *McCleary*, [https://perma.cc/KZ7Z-YYJH], *supra*, at 31. That was correct: the *McCleary* opinion based its holding on a set of specific, detailed facts developed in a lengthy trial. *McCleary*, 173 Wn.2d at 512-13. This court's chosen remedy, to enforce the implementation of ESHB 2261 and the prototypical school model, was based on the evidence presented at trial and the then-current state of legislative funding and research. *Id.* at 546-47. Neither ESHB 2261 nor the prototypical school model required the State to fund capital costs. But neither did they explicitly exclude capital costs.

Our court did terminate jurisdiction in *McCleary* when we determined that the legislature had complied with article IX, section 1 without requiring the legislature to provide for capital costs. But, as stated above, the *McCleary* decision did not address or require capital costs in the first instance—in large part because the legislative scheme enacted in ESHB 2261 did not address this. So our decision to terminate jurisdiction in *McCleary* still did not directly answer the question of whether capital costs are included in the "education" required by article IX, section 1. Instead, our decision to terminate jurisdiction meant that we agreed that the legislature had complied with the specific requirements of our 2012 decision. Ord., *McCleary*, [https://perma.cc/EJP5-L7FP], *supra*, at 1-2, 4 ("The court has

16

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

measured progress specifically according to the areas of basic education identified

in Engrossed Substitute House Bill (ESHB) 2261 (LAWS OF 2009, ch. 548) and the

implementation benchmarks established by Substitute House Bill (SHB) 2776

(LAWS OF 2010, ch. 236).", "The court concludes that the State has complied with

the court's orders to fully implement its statutory program of basic education by

September 1, 2018, and has purged its contempt.").

As a result, we must still decide whether capital expenditures are a

component of the "education" that article IX, section 1 requires the State, alone, to

amply fund.

> II.    Interpreting article IX, section 1 in the context of the Washington
> Constitution compels the conclusion that capital construction costs are
> not a component of the "education" that the State, alone, must amply
> fund

"The ultimate power to interpret, construe and enforce the constitution of

this State belongs to the judiciary." *Seattle Sch. Dist.*, 90 Wn.2d at 496; *Wash.*

*State Highway Comm'n v. Pac. Nw. Bell Tel. Co.*, 59 Wn.2d 216, 222, 367 P.2d

605 (1961) ("The construction of the meaning and scope of a constitutional

provision is exclusively a judicial function."). "When interpreting constitutional

provisions, we look first to the plain language of the text and will accord it its

reasonable interpretation." *Wash. Water Jet Workers Ass'n v. Yarbrough*, 151

Wn.2d 470, 477, 90 P.3d 42 (2004) (citing *Anderson v. Chapman*, 86 Wn.2d 189,

191 543 P.2d 229 (1975)). We also consider the provision at issue in the context of

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

the rest of the constitution. *See Westerman v. Cary*, 125 Wn.2d 277, 288, 892 P.2d 1067 (1994) ("When construing a statute or constitutional provision, the context in which the language arises should also be considered." (citing *Dawson v. Daly*, 120 Wn.2d 782, 791, 845 P.2d 995 (1993)); *Seattle Sch. Dist.*, 90 Wn.2d at 510 ("Careful examination of our constitution reveals that the framers declared *only once* in the entire document that a specified function was the State's *paramount duty*."). If the plain language of the provision in context is ambiguous, we may look to the historical context of the constitutional provision for guidance; this can include the legislative history surrounding a constitutional amendment and material in the official voters' pamphlet. *Wash. Water Jet Workers*, 151 Wn.2d at 477; *Zachman v. Whirlpool Fin. Corp.*, 123 Wn.2d 667, 671, 869 P.2d 1078 (1994) (citing *Wash. Econ. Dev. Fin. Auth. v. Grimm*, 119 Wn.2d 738, 743, 837 P.2d 606 (1992)).

We therefore start with the plain language of article IX, section 1.

A. Article IX, section 1's plain language, "education," alone does not resolve whether the State's duty to amply fund education includes a duty to amply fund all capital costs

"It is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex." WASH. CONST. art. IX, § 1. As

18

stated above, *Seattle School District* defined the term "education" as used in article

IX, section 1 as one that

> "comprehends all that series of instruction and discipline which is intended to enlighten the understanding, correct the temper, and form the manners and habits of youth, and fit them for usefulness in the future. In its most extended signification it may be defined, in reference to man, to be the act of developing and cultivating the various physical, intellectual, aesthetic and moral faculties."

90 Wn.2d at 516. In addition, we held that that education "must prepare our

children to participate intelligently and effectively in our open political system," it

"must prepare them to exercise their First Amendment freedoms both as sources

and receivers of information," and it "must prepare them to be able to inquire, to

study, to evaluate and to gain maturity and understanding." *Id.* at 517-18; U.S.

CONST. amend. I.

McCleary expanded on that definition of article IX, section 1's plain

language.  It held that "education" means "the basic knowledge and skills needed

to compete in today's economy and meaningfully participate in this state's

democracy." 173 Wn.2d at 483. *McCleary* also explained that this right to

education is a right to educational opportunities, not a right to guaranteed

educational outcomes. *Id*. at 524-25.

Thus, *McCleary* and *Seattle School District* both provide broad definitions

of the constitution's term "education."

19

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

But both courts also explicitly stated that the legislature plays a key role in defining the reach of that term. *Seattle Sch. Dist.*, 90 Wn.2d at 518-19; *McCleary*, 173 Wn.2d at 524 ("the legislature properly plays a key role in defining article IX, section 1—though this court remains the final arbiter on questions of interpretation"). In other words, this court has the duty to define the broad constitutional guidelines of an education, and the legislature has the duty to give substantive content to the program of basic education. *McCleary,* 173 Wn.2d at 526; *Seattle Sch. Dist.*, 90 Wn.2d at 518-19.

The legislature has done so. It defines a basic education as

that which is necessary to provide the opportunity to develop the knowledge and skills necessary to meet the state-established high school graduation requirements that are intended to allow students to have the opportunity to graduate with a meaningful diploma that prepares them for postsecondary education, gainful employment, and citizenship. Basic education by necessity is an evolving program of instruction intended to reflect the changing educational opportunities that are needed to equip students for their role as productive citizens and includes the following:
 (a) The instructional program of basic education the minimum components of which are described in RCW 28A.150.220;
 (b) The program of education provided by chapter 28A.190 RCW for students in residential schools as defined by RCW 28A.190.005 and for juveniles in detention facilities as identified by RCW 28A.190.010;
 (c) The program of education provided by chapter 28A.193 RCW for individuals under the age of eighteen who are incarcerated in adult correctional facilities;
 (d) Transportation and transportation services to and from school for eligible students as provided under RCW 28A.160.150 through 28A.160.180; and

20

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

(e) Statewide salary allocations necessary to hire and retain qualified staff for the state's statutory program of basic education.

RCW 28A.150.200(2). Additionally, RCW 28A.150.210 lists four basic education goals.[7] The rest of chapter 28A.150 RCW provides details of the basic education that the legislature outlines above. For example, RCW 28A.150.220 specifies "minimum instructional requirements" that set the minimum hours of instruction.

None of these definitions, goals, or details explicitly include capital construction costs or buildings as an aspect of the basic education required by article IX, section 1's language. But these definitions don't explicitly exclude capital construction costs, either. And it is certainly true that students need buildings, labs, and gyms to gain an education.

---

[7] It lists four broad basic education goals:

(1) Read with comprehension, write effectively, and communicate successfully in a variety of ways and settings and with a variety of audiences;
(2) Know and apply the core concepts and principles of mathematics; social, physical, and life sciences; civics and history, including different cultures and participation in representative government; geography; arts; and health and fitness;
(3) Think analytically, logically, and creatively, and to integrate technology literacy and fluency as well as different experiences and knowledge to form reasoned judgments and solve problems; and
(4) Understand the importance of work and finance and how performance, effort, and decisions directly affect future career and educational opportunities.

RCW 28A.150.210.

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

We therefore conclude that the plain language of article IX, section 1, as interpreted in *McCleary* and *Seattle School District* and as further described by the legislature, does not alone provide an answer.

      B.  In the context of the full constitution, however, article IX, section 1 makes capital construction costs a shared funding responsibility of the school districts and the State, not an exclusive funding responsibility of the State

We therefore examine article IX, section 1 in the context of the rest of the Washington Constitution. Several constitutional provisions address capital construction costs. Taken together, these constitutional provisions (1) treat school capital construction funding differently than they treat other education funding and (2) make it easier for local school districts to raise funds for school capital construction funding than for other education funding.

First, article VII, section 2(a) provides an extension of up to six years for local levies to provide support for school construction and modernization. WASH. CONST. art. VII, § 2(a). But it treats local levies for noncapital school costs separately; it provides an extension of up to only four years for levies to support those nonconstruction costs.

Article VII, section 2(b), also lists capital costs separately. WASH. CONST. art. VII, § 2(b). It permits taxing districts to exceed the general levy limit of one

22

percent of the value of property for the purpose of making required payments of principal and interest on general obligation bonds issued for "capital purposes."

In addition, article IX, section 3 treats school capital construction costs differently. WASH. CONST. art. IX, § 3. It establishes a common school construction fund exclusively to fund the construction of facilities for common schools. The fund draws financing from the sale of timber, from interest accrued on the permanent school fund, and from "such other sources as the legislature may direct."

Finally, article VIII, section 6 treats school capital construction costs differently from other education costs. WASH. CONST. art. VIII, § 6. It generally limits a municipality's ability to incur debt to one and one-half percent of the value of taxable property without the assent of three-fifths of the voters. And even with the assent of three-fifths of the voters, a municipality cannot exceed five percent indebtedness on the value of taxable property. But it contains two exceptions to this limit: it permits a locality to incur debt greater than the five percent limit of the value of taxable property for water, light, and sewer supplies and for a school district's "capital outlays."

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

The State argues that these provisions show that the constitution treats school capital costs as a shared responsibility between the State and local school districts.[8] State of Wash.'s Resp. Br. at 30.

We agree.

Most of the constitutional provisions summarized immediately above provide for sharing capital construction costs between the local school district and the State. They create a workable scheme (with State guaranties) for local school districts to float levies and issue bonds for capital construction costs. And they give local school districts more flexibility to raise funds for capital construction than for other education funding needs.

In other words, when we interpret article IX, section 1 in the context of the rest of the constitution, it is clear that the constitution as a whole treats funding for school capital costs differently than it treats funding for other education costs. In general, the constitution provides greater flexibility for local districts to raise funds for school capital construction—creating a scheme in which the State and local districts share the responsibility for funding school capital construction.

---

[8] There is one provision that seemingly applies to both school construction costs and general school costs. Article VIII, section 1(e) states that the "state may pledge the full faith, credit, and taxing power of the state to guarantee the voter approved general obligation debt of school districts in the manner authorized by the legislature. Any such guarantee does not remove the debt obligation of the school district and is not state debt." WASH. CONST. art. VIII, § 1(e).

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

C. The Washington Constitution treated school capital costs differently
from other education costs from the earliest days

We can also look to the historical context and development of a

constitutional provision for guidance. *Wash. Water Jet Workers*, 151 Wn.2d at 477;

*Zachman*, 123 Wn.2d at 671. The historical context shows that the constitution, the

legislature, and the people have historically treated capital construction costs

differently from other education costs. And the burden of funding those costs has

always been shared between the State and the locality.

First, the development of article IX, section 3 shows that historically—from

the time of statehood until the middle of the 20th century—school construction

costs were a local obligation. Article IX, section 3 of our state constitution creates

both a common school fund and common school *construction* fund. However, the

common school construction fund was not added until 1966.

One early case from our court, *Sheldon v. Purdy*, interpreted the original text

of article IX, section 3—that is, the language that created the common school fund

before the common school *construction* fund was added to article IX, section 3. 17

Wash. 135, 140, 49 P. 228 (1897).  The issue in *Sheldon* was whether funds held

by the county treasurer that originated from both the constitutional common school

fund as well as a county common school tax could be used to pay interest on bonds

a school district issued for the purpose of constructing a school. *Id*. at 136-38. We

held, in part, that the common school funds could not be used for such a purpose:

25

> This fund, under the constitution, is devoted to the support of the public schools. That portion coming from the irreducible common school fund is devoted to the payment of current expenses. The building of new school houses and the purchase of school house sites do not come within any authorized signification of "current expenses." Neither do they come within any well-defined acceptation of "support of the common schools." Both the terms "support" and "current expenses," when applied to the common schools of this state, mean continuing regular expenditures for the maintenance of the schools. Building a new school house and purchasing a site, while at times necessary and proper, are unusual and extraordinary expenditures; and the legislature, in consonance with the constitution, has evidently had this in mind. Two methods have been provided for building school houses—the first by a special tax levied by the district as provided in § 818, and the second as prescribed by § 2697—the bond act. In both ways the school district, alone and locally, assumes the responsibility of the expenditure; and it may not divert taxes raised for other purposes by the county commissioners, and paid by a general tax of the county, and aided by appropriations from the state to the payment of its special local debt.

*Id*. at 140-41.

The State relies on *Sheldon* to argue that article IX, section 1 excludes school construction costs. State of Wash.'s Resp. Br. at 48-49. The State is correct that the common school fund established by the original article IX, section 3 did not provide state funding for school capital construction costs—as *Sheldon* stated in the quoted passage above. It was not until 1966 that article IX, section 3 was amended to create the fund specifically to provide state support for school construction.

This certainly shows that the State's burden to support the construction of schools increased over time. But it also shows that the State's burden to support the

26

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

construction of schools was always treated as separate from the State's burden to fund other education costs.

The history of article VII, section 2(a) compels the same conclusion. It also treated school capital costs and other school costs differently, and it also provided the local districts with greater flexibility to raise funds for school capital costs than for other school costs. As discussed above, article VII, section 2(a) was the one that was amended in 1976 to add the exception giving local districts greater flexibility to levy taxes for common schools. WASH. CONST. art. VII, § 2(a) (amend. 64). Then, in 1986, the provision was amended again so that local districts could levy additional taxes for the construction or modernization of school facilities. *Id.* (amend. 79).

Article VIII, section 6 has a similar history. It was amended in 1952 to include its current language, allowing indebtedness for school construction to exceed the otherwise applicable one and a half percent debt limit. WASH. CONST. art. VIII, § 6 (amend. 27).

This history confirms that the Washington Constitution treats school construction costs differently than it treats other school costs. It shows that the constitution gives local school districts greater ability to raise local funds for school capital costs than for other school purposes. Additionally, as article IX, section 3 and *Sheldon* show, our constitution gave the State no constitutional

obligation to assist in funding school capital costs at all until 1966—historically, the local districts had to fund their own school construction projects.

> D. The Washington Constitution provides that the State shares the responsibility to fund school capital construction costs with local school districts

The language, context, and development of the constitution confirm that that document treats school capital costs differently from other education costs. This language, context, and development also show that the State *shares the responsibility for such capital costs with the local districts*. The State acknowledges this shared responsibility. State of Wash.'s Resp. Br. at 30 ("the Constitution treats such costs as a shared responsibility between the State and local school districts," 57 (the "State's position in this case" is that "public school construction is a shared responsibility between the State and local voters").

The WSD, however, does not.  It has maintained throughout this case that the State bears sole responsibility for funding school capital construction costs. CP at 28 (complaint); WSD's Opening Br. at 21-23, 19 ("'the paramount' duty does not mean 'a shared' duty" (italics omitted)).  As a result, the WSD did not address how much responsibility the State might bear for school capital construction costs if it were less than 100 percent of those costs.

We therefore do not address whether there are constitutional parameters to this shared responsibility. We hold only that the article IX, section 1 "education"

*Wahkiakum Sch. Dist. v. State*, No. 101052-4

for which the State, alone, must provide ample funding does not include school

capital construction costs.

CONCLUSION

The Washington Constitution (1) treats capital construction costs differently

from other educational costs, (2) provides local districts with greater flexibility to

raise funds for capital construction costs than for other educational costs, and (3)

allocates shared responsibility for school capital costs to the state and the local

districts. As a result, school capital construction costs are not a component of the

"education" that the State, alone, must amply fund under article IX, section 1.

We therefore affirm the trial court's decision to grant the motion to dismiss.

Gordon McCloud, J.

WE CONCUR:

González, C.J.

Stephens, J.

Yu, J.

Madsen, J.

Montoya-Lewis, J.

Owens, J.

O'Donnell, J.P.T.

*Wahkiakum Sch. Dist. No. 200 v. State*

No. 101052-4

JOHNSON, J. (concurring)—The Wahkiakum School District argued only that by not providing the full cost of school capital construction the State has not met the burden set in article IX, section 1 of the Washington Constitution. The majority opinion thus looked solely at this argument, assessing whether capital costs are included in the paramount duty to provide education that we have established belongs wholly to the State. I concur in the majority conclusion that school capital construction costs are not a component of the education that the State alone must amply fund under article IX, section 1. However, the parties did not brief anything about whether article IX, section 3 provides any further obligation regarding capital costs. On remand, the parties should examine how much responsibility the State may bear for capital construction costs if it is not solely responsible for such costs and whether article IX, section 3 creates an obligation on the part of the State to spend money generated from the common construction fund in a certain manner.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Wahkiakum Sch. Dist. No. 200 v. State*, No. 101052-4
(Johnson, J., concurring)

Article IX, section 3[1] first establishes the common school fund and lays out

sources of funding. It also establishes the common school construction fund, which

---

[1] "**SECTION 3 FUNDS FOR SUPPORT.** The principal of the common school fund as the same existed on June 30, 1965, shall remain permanent and irreducible. The said fund shall consist of the principal amount thereof existing on June 30, 1965, and such additions thereto as may be derived after June 30, 1965, from the following named sources, to wit: Appropriations and donations by the state to this fund; donations and bequests by individuals to the state or public for common schools; the proceeds of lands and other property which revert to the state by escheat and forfeiture; the proceeds of all property granted to the state when the purpose of the grant is not specified, or is uncertain; funds accumulated in the treasury of the state for the disbursement of which provision has not been made by law; the proceeds of the sale of stone, minerals, or property other than timber and other crops from school and state lands, other than those granted for specific purposes; all moneys received from persons appropriating stone, minerals or property other than timber and other crops from school and state lands other than those granted for specific purposes, and all moneys other than rental recovered from persons trespassing on said lands; five per centum of the proceeds of the sale of public lands lying within the state, which shall be sold by the United States subsequent to the admission of the state into the Union as approved by section 13 of the act of congress enabling the admission of the state into the Union; the principal of all funds arising from the sale of lands and other property which have been, and hereafter may be granted to the state for the support of common schools. The legislature may make further provisions for enlarging said fund.

"There is hereby established the common school construction fund to be used exclusively for the purpose of financing the construction of facilities for the common schools. The sources of said fund shall be: (1) Those proceeds derived from the sale or appropriation of timber and other crops from school and state lands subsequent to June 30, 1965, other than those granted for specific purposes; (2) the interest accruing on said permanent common school fund from and after July 1, 1967, together with all rentals and other revenues derived therefrom and from lands and other property devoted to the permanent common school fund from and after July 1, 1967; and (3) such other sources as the legislature may direct. That portion of the common school construction fund derived from interest on the permanent common school fund may be used to retire such bonds as may be authorized by law for the purpose of financing the construction of facilities for the common schools.

"The interest accruing on the permanent common school fund together with all rentals and other revenues accruing thereto pursuant to subsection (2) of this section during the period after the effective date of this amendment and prior to July 1, 1967, shall be exclusively applied to the current use of the common schools.

"To the extent that the moneys in the common school construction fund are in excess of the amount necessary to allow fulfillment of the purpose of said fund, the excess shall be available for deposit to the credit of the permanent common school fund or available for the current use of the common schools, as the legislature may direct."

2

*Wahkiakum Sch. Dist. No. 200 v. State*, No. 101052-4
(Johnson, J., concurring)

is to be used exclusively for financing the construction of common school facilities, and lays out the sources of funding. The section establishing the common school construction fund was added by amendment in 1966. In the voters' pamphlet, the amendment was proposed as one part of a three-part package intended to provide immediate and long-term funds for local school construction. The package was to fund school facility construction while easing the tax burden on local property owners. The pamphlet, drafted by the legislature, specifically noted that overburdened local school districts were facing significant hardships to finance school construction, with some districts needing to increase local property taxes as much as double. The amendment was passed as a way to avoid such tax increases. The common school construction fund was intended to provide money for new facilities to districts that required the State's assistance. Today, that assistance is out of reach for some of the districts that need it most.

In the present day, local school districts access the funding from the common school construction fund through the School Construction Assistance Program (SCAP). Through SCAP, the State will provide funding assistance to help local school districts pay for school facility construction. However, to receive that funding, the school district must first raise revenues to demonstrate there is matching local financial support for the proposed project (referred to as "local

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

validation"). WASH. OFF. OF SUPERINTENDENT OF PUB. INSTRUCTION, SCHOOL

CONSTRUCTION ASSISTANCE PROGRAM: SUMMARY HANDBOOK 9 (2021),

https://www.k12.wa.us/sites/default/files/public/schfacilities/pubdocs/SCAP%20Su

mmary%20Handbook%20FINAL.pdf [https://perma.cc/2DA4-DA9F]. Districts

raise local funds to finance capital improvements or construction through things

like the sale of bonds, sale of short-term obligations, voter-authorized capital

levies, proceeds from investments of capital project money, and mitigation and

impact fees. Most methods are funded through property taxes on real property in

the district. The State will not distribute any funds until the district has expended

its share of the costs for the project.

For large counties, this is acceptable as income levels and population density

are relatively high. Those districts have more money and also more people to share

in the cost of school facility construction. For small districts, the requirement that

local districts raise matching funds first can be prohibitive. For Wahkiakum,

raising the necessary funds has not been possible, and voters have repeatedly

decided against the proposed measures.

As the district has pointed out, Wahkiakum is a small and rural county.

Voters have a per capita income around $29,000, with 57 percent of students from

low-income households. They have been unable to raise local funding sources

needed to qualify for SCAP funding because the voters do not want to pay the

additional local taxes. Even if they could pass a measure to fund the necessary construction, it would certainly be burdensome to local residents.

Wahkiakum has been denied access to SCAP thus far. Because they cannot access SCAP, the district's only option is to apply for a small school district modernization grant. The State notes that the capital construction fund has excess funds available to districts without a showing of local support. Such grants are intended for school districts of 1,000 students or fewer with school facilities that have significant building system deficiencies. However, such grants are limited in amount and are not accessible for districts where the facilities need to be replaced or require extensive modernization. The existing fund distribution system does not offer relief to Wahkiakum.

In its briefing, the State said that the legislature has appropriated half a billion dollars to support the SCAP fund, with an additional $3.9 billion projected for future biennia. The fund for small school district modernization grants amounts to $49.7 million. Essentially, the State is saying that the construction funds are there, but districts like Wahkiakum are denied access to them. The way SCAP is structured seems to be the exact opposite of what the construction fund was created to provide. The existing program does not help the districts that need it the most because they cannot pass the necessary bond. The State should not selectively deny

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

funds for high quality education environments based on the district's lack of local monetary support.

As the majority and State point out, the district's claim in this case was not that the State must appropriate enough money so that certain school districts do not fall below some unspecified threshold based on a school district's voter base's willingness and practical ability to raise funds itself. The district should make that argument. On remand, the parties should discuss how much responsibility the State may bear for school capital construction costs if it is less than 100 percent of those costs, and whether article IX, section 3 creates an obligation that the common school construction fund be distributed in a manner that is accessible to the low-income, rural districts.

_____
Johnson, J.